IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 08–cv–01133–KMT–CBS

COORSTEK, INC., a Delaware corporation,

    Plaintiff,

v.

STEVEN F. REIBER, and
MARY L. REIBER, individuals,

    Defendants.

---

# ORDER

---

This matter is before the court on "Coorstek's Expedited Motion to Compel Dicovery (sic) of Communications Between Robert Atkin and Defendants' Patent Counsel" [Doc. No. 111, as redacted for public filing (filed under seal November 25, 2009, sealed Doc. No. 112)] (hereinafter "Motion"). Defendants Steven F. Reiber and Mary L. Reiber ("Reibers") filed "Defendants' Opposition to Coorstek, Inc.'s Expedited Motion to Compel Discovery of Communications Between Robert Atkin and Defendants' Patent Counsel" [Doc. No. 120, under seal] on December 10, 2009 (hereinafter "Resp."). Plaintiff filed "Coorstek's Reply in Further Support of Expedited Motion to Compel Dicovery (sic) of Communications Between Robert Atkin and Defendants' Patent Counsel" [Doc. No. 126, under seal] on December 23, 2009 (hereinafter "Reply"). A hearing was held on January 20, 2010, and the matter was taken under

advisement. After review of the pleadings, including Plaintiff's Notice [Doc. No. 132] concerning the California state matter between the Reibers and Robert Atkin, the matter is ripe for resolution by the court.

***BACKGROUND***

Plaintiff CoorsTek, Inc. ("CoorsTek") seeks a declaration that U.S. Patent No. 6,354,479, No. 6,651,864, No. 6,935,548, and No 7,023,802 (collectively the "Patents-in-Suit") are not infringed and/or that they are invalid and/or unenforceable. (First Am. Compl. [Doc. No. 63 at ¶¶ 7, 33-43].) The Reibers are listed as the sole and exclusive inventors on the face of each of the Patents-in-Suit. (First Am. Compl., Exs. A-D.) Plaintiff's patent unenforceability claim is based, in part, on allegations that the Reibers engaged in inequitable conduct or fraud on the United States Patent and Trademark Office during prosecution of the Patents-in-Suit by failing to disclose, with intent to deceive, that Dr. Robert Atkin was a co-inventor of a significant number of the claims of the Patents-in-Suit. (Mot. at 3.)

Dr. Atkin is the owner of RA Engineering, doing business as IMT, a company unrelated to the Reibers. (Mot., Ex. B, Nov. 16, 2009 Partial Deposition Transcript of Robert Atkin at 7-8.) Dr. Atkin has a Doctorate of Engineering in ceramic materials science and has significant experience in ceramic materials processing. (*Id.* at 42-43.)

P.E. Ceramic is a "ceramic processing" company originally founded by Roy Valdez, Wayne May, and Tom Morris. (Resp., Ex. B, April 15, 2008 Partial Deposition Transcript of Robert Atkin at 105-106.) In or about 1998, Roy Valdez contacted Atkin about P.E. Ceramic. (*Id.* at 106.) Atkin visited PE Ceramic's shop and spoke with the other owners at Roy Valdez's

2

request and "thought maybe [he] could help this partnership, which was having problems." (*Id.* at 106-07.) Atkin thereafter contributed "a little bit of resources from RA Engineering" into P.E. Ceramic. (*Id.*) Atkins stated he "paid them -- I gave them some money, and got a stock option to become part of the company, become owner of the company when they were incorporated, and I continued being interested in them. I gave them advice and gave them, you know, some used equipment and some money." (*Id.* at 107.) Atkin and P.E. Ceramic entered into a Memorandum of Understanding on April 2, 1998, providing an ownership interest to Atkin when P.E. Ceramic incorporated, including a plan for Atkin to buy shares and interests from the three initial principals over time. (Resp., Ex. D.) At some point, business cards showing Dr. Robert Atkin associated with P.E. Ceramic Co. were created. (Resp., Ex. C.)

In or about December 2008, the Reibers began working with attorney John Ferrell of Carr & Ferrell to obtain the Patents-in-Suit. P.E. Ceramic developed a client relationship with the Reibers wherein P.E. Ceramic was to help the Reibers with certain technical aspects of their inventions necessary to acquire the patents, including "to develop some ceramic materials . . . to use for bonding tools" and to assist the Reibers "in writing some of the technical material" to obtain the patents. (Mot., Ex. E, January 27, 2009 Partial Deposition Transcript of Mary Reiber at 151.) The Reibers, through their business MSJ Company, and P.E. Ceramic entered into a non-disclosure agreement with respect to the work to be done. (Resp., Ex. E.) The agreement provided that whatever work P.E. Ceramic did for the Reibers "shall be and remain the property of MSJ Company, and P.E. Ceramics (sic) Co. shall have no ownership right with regard to the same." (*Id.*) Atkin was not a signatory to the non-disclosure agreement. It does not appear that

3

P.E. Ceramic had incorporated at the time the non-disclosure agreement was executed by Tom Morris on behalf of P.E. Ceramic, nor is there any indication Atkin had begun to acquire stock in the company.

Dr. Atkin was brought in to do work for the Reibers subsequent to the Reibers' and P.E. Ceramic's contractual agreement. In other words, once the Reibers were clients of P.E. Ceramic, P.E. Ceramic referred some of the Reibers' work to Atkin who was to perform under P.E. Ceramic's name. (Reply, Ex. L, November 6, 2009, Partial Deposition Transcript of Robert Atkin at 203-204.) With respect to Dr. Atkin's role in the applications for the patents-in-suit, the Reibers instructed Atkin

> to try to cover all the possible ways that bonding tips could be manufactured to achieve the desired result. . . .
>
> They simply told me what – that they wanted to make sure that I had thought of all the possibilities, the galaxy of possible ways of accomplishing this result, and write them so that no one could later circumvent their patent by doing something that I could imagine that would possibly result in a desired result.

(*Id.* at 225.)

In connection with the work to be performed for the Reibers by P.E. Ceramic, Dr. Atkin met with patent counsel, John Ferrell, and the Reibers in late December 1998. It is this conversation which is the subject of the pending motion. What is known about that conversation, at this point, is that John Ferrell, the Reibers and Atkin discussed that Atkin "was the technical guy" and that Atkin's role was to write up different ways to use materials in the inventions for which patent protection was sought so the patents could not be circumvented. (Mot., Ex. D at 156-157; Mot., Ex. B at 179-180.)

At the time of the December 1998 meeting between Ferrell, the Reibers and Atkin, the three principals of P.E. Ceramic did not view Dr. Atkin as a P.E. Ceramic employee. Tom Morris asked Dr. Atkin to put any reports he created for the Reibers on P.E. Ceramic letterhead, instead of on the letterhead of RA Engineering, the company owned by Atkin. Further, Atkin and Morris agreed that Atkin would not submit any billing directly to the Reibers, but only through P.E. Ceramic. (Reply, Ex. L at 203-04.) P.E. Ceramic, then, would be responsible for payment to Dr. Atkin when the Reibers made payment to P.E. Ceramic. (Rsp., Ex. B at 149-50.) Several of the "ideas" which were contained in a February 1998 transmission to the Reibers and their attorney for inclusion in the patent applications (Mot., Ex. I), were a collaborative effort between Dr. Atkin, Steve Reiber and Wayne May of P.E. Ceramic, even though Atkin was the putative author. (*Id.* at 206-208; 222-223; 231.)

CoorsTek seeks a ruling from this court that the presence of Robert Atkin at the December 1998 meeting between the Reibers and their patent counsel caused the meeting to lose its confidential nature and lose the protection of the attorney-client privilege. Further, CoorsTek argues that, to the extent the court finds the meeting originally cloaked by the attorney-privilege, such privilege has been waived by subsequent voluntary disclosures about the meeting. CoorsTek seeks authorization from this court to depose Robert Atkin further to inquire about the December 1998 meeting.

*ANALYSIS*

*A.     Privilege*

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *In re Qwest, Communications Intern. Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  The attorney-client privilege protects from discovery communications made in confidence between the client and the attorney.  *EEOC v. Outback Steakhouse of Florida*, 251 F.R.D. 603, 610 (D. Colo. 2008).  "The lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out."  *Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002) (quoting *In re Bieter Co.*, 16 F.3d 929, 937-38 (8th Cir. 1994).  In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client.  *United States v. Johnston*, 146 F.3d 785, 794 (10th Cir. 1998); *In the Matter of Grand Jury Subpoena*, 697 F.2d 277, 278 (10th Cir. 1983).

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co*., 449 U.S. at 389.  The party seeking to invoke the attorney-client privilege bears the burden of establishing its applicability and the lack of waiver of any privilege.  *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999).  *See also United States v. Phelan*, 3 Fed. App'x 716, 718 (10th Cir. 2001).

In federal court, the law controlling determination of privilege issues depends upon the dictates of Rule 501 of the Federal Rules of Evidence. Rule 501 states

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

*Id.* Jurisdiction in this case is premised upon the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202. Plaintiff asserts this court also has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338, because this case presents a federal question under the Patent Act of 1952 (as amended), 35 U.S.C. §§ 1, et seq. with state law supplemental jurisdiction pursuant to 28 U.S.C. §1367(a). Therefore, federal common law with respect to privilege governs this conflict.

Under federal common law, the attorney-client privilege arises (1) where legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) unless the protection is waived. *See Williams v. Sprint/United Management Co.*, No. 03-2200-JWL-DJW, 2006 WL 266599, at *2 (D. Kan. Feb. 1, 2006).

Generally, disclosing attorney-client communications to a third party results in a waiver of the attorney-client privilege. *See In re: M & L Business Machine Co., Inc.*, 161 B.R. 689, 693

(D. Colo. 1993) ("the attorney-client privilege is lost if the substance of the confidential communication is disclosed to a third party, even inadvertently."); *Sedillos v. Board of Education of School Dist. No. 1*, 313 F. Supp. 2d 1091, 1093 (D. Colo. 2004) ("the attorney-client privilege can be waived by [a]ny voluntary disclosure by the client of an otherwise privileged confidential communication").

The attorney-client privilege can extend to communications between representatives of the client or between the client and a representative of the client, if the communication was made in confidence for the primary purpose of obtaining legal advice. *Austin v. Denver ex rel. Board of Water Com'rs,* 05-cv-01313-PSF-CBS, 2006 WL 1409543, at *4 -5 (D. Colo. May 19, 2006); *Williams,* 2006 WL 266599, at *3. The "*sine qua non* for invocation of the privilege is that the communications in question were intended to be confidential." *Gottlieb v. Wiles*, 143 F.R.D. 241, 249 (D. Colo. 1992) (citing *United States v. Rockwell Intern.*, 897 F.2d 1255, 1265 (3d Cir. 1990)); *Bethel v. U.S. ex rel Veterans Admin. Medical Center*, 55-cv-01336-PSF-KLM, 2008 WL 45382, at *7 -8 (D. Colo. Jan. 2, 2008). The presence of a third party will not destroy the attorney-client privilege if the third party is the attorney's or client's agent or possesses commonality of interest with the client. *See, e.g., Weatherford v. Bursey*, 429 U.S. 545, 554 (1977) (finding that attorney-client communications in the presence of a third party not the agent of either are generally not protected by privilege); *Bethel, id.*

Courts applying the rationale of the *Upjohn* and *Bieter* cases to third party communications with an attorney have held that confidential communications between a party's

counsel and a non-testifying expert or consultant, hired in anticipation of litigation, are protected by the attorney-client privilege. *See Western Resources v. Union Pacific Railroad Co.*, 00-20430CM, 2002 WL 181494, at *7 (D. Kan. Jan. 31, 2002); *Fru-Con Const. Corp. v. Sacramento Mun. Utility Dist.*, S-05-0583 LKK GGH, 2006 WL 2255538 (E.D. Cal. Aug. 7, 2006); *In re Grand Jury Subpoena Dated March 9, 2001,* 179 F. Supp. 2d 270, 283 (S.D.N.Y. 2001). The penultimate question is whether the third-party communication was made in confidence for the purpose of obtaining legal advice from the lawyer. *Compare Carter v. Cornell University*, 173 F.R.D. 92, 94-95 (S.D.N.Y.1997) (holding that the attorney-client privilege extended to interviews with university employees conducted at the request of counsel and for the exclusive use of counsel in providing legal representation) and *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F. Supp. 156, 161 (E.D.N.Y. 1994) (outside consultants hired by defendants to conduct environmental studies were not encompassed by the attorney-client privilege where their function was not to put information gained from defendants into usable form for their attorneys to render legal advice, but rather, to collect information not obtainable directly from defendants).

      The District of Colorado and other courts have adopted the "functional equivalent" test enunciated in *Horton v. United States* to help determine whether to extend the attorney-client privilege to third parties acting at the behest of a client or their attorney. 204 F.R.D. at 672 (requiring party asserting privilege to make a "detailed factual showing" that third party is the "functional equivalent" of an employee). *See also, Energy Capital Corp. v. United States*, 45 Fed. Cl. 481, 492 (Fed. Cl. 2000) (plaintiff failed to meet his burden of proving by a detailed

factual showing that third party was the functional equivalent of an employee). In an attempt at rational definition, the District Court for the Southern District of New York distilled the "functional equivalent" test down to three basic elements with respect to outside consultants: (1) "whether the consultant had primary responsibility for a key corporate job," (2) "whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation," and (3) "whether the consultant is likely to possess information possessed by no one else at the company." *See Export-Import Bank v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005); *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp.2d 958, 962 (N.D. Ill. 2009) (adopting the functional equivalent definition).

As with corporate consultants, application of the privilege to communications with an independent contractor is determined on a case-by-case basis. *Residential Constructors, LLC v. Ace Property and Cas. Ins. Co.* 2:05-cv-01318-BES-GWF, 2006 WL 3149362, at *13 (D. Nev. Nov. 1, 2006). Courts have reached varying results in applying this test. *See Bieter*, 16 F.3d at 937-38 (consultant who was contracted to provide advice and guidance regarding commercial and retail development for the company was a functional equivalent of an employee); *Horton*, 204 F.R.D. at 672 (property management company employee was not the functional equivalent of an employee of the property owner); *Export-Import Bank*, 232 F.R.D. at 113 (financial consultant was not the functional equivalent of an employee); *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213, 218-19 (S.D.N.Y. 2001) (public relations consultant who consulted with the company's counsel regarding a pending investigation was the functional equivalent of

an employee pursuant to federal common law); *Royal Surplus Lines Insurance Co. v. Sofamor Danek Group, Inc.,* 190 F.R.D. 463, 472-473 (W. D. Tenn. 1999) (insurance broker who consulted with the insured and its counsel regarding an insurance policy dispute was a corporate representative under Tennessee privilege law); *Western Resources*, 2002 WL 181494, at *7 (expert consultant retained in anticipation of litigation was corporate representative within scope of Kansas attorney-client privilege).

In this case the Reibers specifically hired P.E. Ceramic to help them finalize and write up their inventions in conjunction with their patent attorneys in order to apply for the Patents-in-Suit. They took specific precautions to ensure that any communications between themselves and P.E. Ceramic would be confidential and would remain their property. The Reibers have made a detailed factual showing that the non-employee, Atkin, "is the functional equivalent of an employee and that the information sought from the non-employee would be subject to the attorney-client privilege if he were an employee of the party." *Horton*, 204 F.R.D. at 672.

Contrary to the argument of Plaintiff, between the business card identifying Dr. Atkin as a member of P.E. Ceramic, the billing for Atkin's work through P.E. Ceramic and Dr. Atkin's only relationship with the Reibers coming through P.E. Ceramic, Atkin most certainly did represent himself to be associated with P.E. Ceramic in an employee-like manner. Apparently, so long as P.E. Ceramic was not cut out from its middleman status, P.E. Ceramic was content to allow Dr. Atkin to retain the primary responsibility for providing the services to the Reibers for which P.E. Ceramic had been hired and was being paid. As noted by Dr. Atkin, in preparing the written material for the patent attorneys, Atkin, Reiber and Wayne May of P.E. Ceramic worked

closely together on critical issues related to the patent applications. Finally, in a dispute where one central issue is whether or not Atkin is an undisclosed co-inventor, Atkin's testimony concerning information exchanged with the patent attorney and the Reibers is not possessed by anyone outside those at the December 1998 meeting.

The Supreme Court in *Upjohn* instructs that the attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390. Therefore, this court finds that the information exchanged between the Reibers, Dr. Atkin, and the patent counsel from Carr & Ferrell at the December 1998 meeting was, at its inception, covered by the attorney-client privilege and is protected from disclosure absent a valid waiver.

### B. Waiver

The attorney-client privilege is usually narrowly construed because it inhibits the truth finding process. *Sedillos*, 313 F. Supp. 2d at 1093. Because the thrust of the privilege is to protect confidentiality, "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party." *United States v. Ryans*, 903 F.2d 731, 741 n. 13 (10th Cir. 1990); *In re Qwest Communications*, 450 F.3d at 1185 ("voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege"); *United States v. Berand*, 877 F.2d 1463, 1465 (10th Cir. 1989). The confidentiality of communications covered by the privilege "must be jealously guarded by the holder of the privilege" lest it be waived. *In re Qwest Communications,* at 1185. "The courts will grant no

greater protection to those who assert the privilege than their own precautions warrant." *Ryans* at 741 n.13.

CoorsTek argues that disclosures about portions of the December 1998 meeting elicited from Dr. Atkins and Mary Reiber at various depositions, as well as disclosure of Atkin's written product for inclusion in the patent applications, constitute a waiver of the attorney-client privilege with respect to the entirety of the December 1998 meeting.

### 1. *Testimony of Mary Reibers*

During a deposition taken of Mary Reiber, Ms. Reiber described John S. Ferrell as a patent attorney used by herself and Steve Reiber. (Mot., Ex. E, Partial Deposition Transcript of Mary Reiber dated January 27, 2009 at 150.) Further, she described Robert Atkin as ". . .a PhD. in ceramics that I met through the company P.E. Ceramics." (*Id.*) She then stated that "P.E. Ceramics tried to develop ceramic materials for us to use for bonding tools." (*Id.* at 151.)

The testimony of Mary Reiber upon which CoorsTek relies to assert she waived attorney-client privilege for the contents of the communications at the December 1998 meeting was elicited during an earlier deposition of Ms. Reiber on March 12, 2008.

> Q  So there was a joint meeting between you, an attorney at Carr & Ferrell and Bob Atkins?
> M. REIBER  I think John Ferrell himself, Steven, and I don't know who else was present.
> . . .
> Q  In terms of the proximity to the patent application, was it within a month of filing the patent application that this meeting occurred?
> A  I have no idea.
> Q  Do you have any records which describe that meeting?
> A  I don't.

13

| | |
|---|---|
| Q | And at this meeting, did Mr. Atkins provide Mr. Ferrell this report that you've indicated that you testified about? |
| A | I don't know if this was an initial meeting where we talked with them about the information we'd like for him to provide. |
| Q | Do you recall what information was discussed that you would have liked for Mr. Atkins to provide your patent attorney? |
| A | No; just something about ceramics. |

(Mot., Ex. H, Partial Deposition Transcript of Mary Reiber, March 12, 2008 at 136-7.)

A general description of the work performed by an attorney is not protected by the attorney-client privilege. Acts or services performed by an attorney during the course of the representation are not within the privilege because they are not communications. *Kovacs v. Hershey Co.*, 04-cv-01881-WYD-BNB, 2006 WL 3054167, at *2 (D. Colo. Oct. 25, 2006). "The subject matter of meetings with an attorney, the persons present, the location of the meetings, or the persons arranging the meetings are not protected by the privilege." *Burton v. R.J. Reynolds Tobacco Co., Inc.*, 170 F.R.D. 481, 484-85 (D. Kan. 1997); *In re Universal Service Fund Telephone Billing Practices Litigation,* 232 F.R.D. 669, 675 (D. Kan. 2005); *Stabilus v. Haynesworth, Baldwin, Johnson and Greaves, P.A.*, 144 F.R.D. 258, 268 (E.D. Pa. 1992) ("only the communication itself is privileged; the underlying facts, as well as the factual circumstances surrounding the attorney-client relationship, are discoverable) (internal citation omitted).

This court agrees with the reasoning of *Kovacs* and finds that the information given by Mary Reiber "is no more than a general description of the subject matter of the discussion . . . and is too vague to constitute a waiver of the attorney-client privilege." *Kovacs*, 2006 WL

3054167, at *3 (citing *EEOC v. Johnson & Higgins*, 93 CIV. 5481(LBS), 1998 WL 778369, at *13 (S.D.N.Y. Nov. 6, 1998).

### 2. February 9, 1999 Transmission from Atkin to the Reibers and Lawyers at Carr & Ferrell

The fax transmission which plaintiff alleges waives the attorney-client privilege with respect to the December 1998 meeting is attached as Exhibit I to the Motion. The first page of Exhibit I is a simple fax transmission cover sheet dated "8-Feb-99" with the message "Dear Mary Lou, the following has been submitted to John S. Ferrell." (*Id.* at 1.) The fax cover sheet indicates the transmission originated from "Robert Atkin P.E. Ceramics (sic), 530-823-7897 cell 805-452-3841." (*Id.*)

The next two pages of the transmission contain technical information broken out into Sections 1, 2 and 3. (*Id*. at 2-3.) There is no personal or opinion-type information contained on those two pages with the exception of a few handwritten notations correcting typographical errors.[1] The parties do not disagree that the information contained on pages 2 and 3 of Exhibit I appears nearly word for word in the background section of the Patents-in-Suit documentation. The document therefore appears to be a portion of the information P.E. Ceramic was retained to provide to the Reibers as part of their confidential arrangement while attempting to perfect the Patents-in-Suit. (*See* Mot., Ex. F.)

Although this communication was originally marked as privileged and was included on the Reibers' privilege log, the document was later voluntarily produced in discovery. Clearly,

---

[1] Such as changing "I" to "It" and "is" to "in."

the production of this document in discovery waives any attorney-client privilege which otherwise might have attached to the document itself. However, arguing that this letter alone is sufficient in scope to waive the attorney-client privilege with respect to an otherwise privileged communication occurring at or near the time Dr. Atkin first met with the Reibers' patent counsel is to leap a giant chasm of logic.

Waivers of the privilege have been held to be "narrowly construed." *Kovacs,* 2006 WL 2781591, at* 6 (referencing *Dexia v. Credit Local v. Rogan*, 231 F.R.D. 268, 276 (N.D. Ill. 2004)). "The scope of the waiver turns on the scope of the . . . disclosure, and the inquiry is whether the . . . disclosure involves the same 'subject matter' as the desired testimony." *Sedillos*, 313 F. Supp. 2d at 1094 (quoting *United States v. Collis*, 128 F.3d 313, 320 (6th Cir.1997)).

The February 8, 1999 faxed document does not reference the December meeting, what was requested at the meeting, any communication of the attorney to Dr. Atkin or any instructions given to Dr. Atkin by the Reibers or Carr & Ferrell. It is simply a transmission of a body of technical writing applicable to the inventions underlying the Patents-in-Suit. The document does not even state or infer that Dr. Atkin actually wrote or participated in writing the technical information attached. Robert Atkin, of P.E. Ceramic, is merely the person sending the fax and noting that the same document was sent to Mr. Ferrell. Narrowly construing the issue of waiver, this court finds that voluntary production of the fax transmission does not constitute a waiver of the attorney-client privilege which covers the December 1998 communications between Atkin, the Reibers and Carr & Farrell.

### 3. *Testimony of Dr. Atkin*

Portions of Dr. Atkin's deposition have already been quoted herein. (*See e.g.*, *supra* at 3-4.) During Dr. Atkin's first deposition on April 15, 2008, the Reibers' counsel objected prior to any of the testimony on the basis of attorney-client privilege. Ms. Lee, for the Reibers, and Mr. Watkins discussed the Reibers position that communications during the December 1998 meeting were covered by the attorney-client privilege. Although challenged by Mr. Watkins, Ms. Lee maintained the Reibers' right to instruct Dr. Atkin not to answer certain specific questions, stating

> MS. LEE   And I'm entitled to instruct him not to answer in order to protect the Reibers' privilege. And if Dr. Atkin refuses to follow my instruction, I would ask that we suspend the deposition and get the judge on the phone.

(Rsp., Ex. B, Partial Deposition Transcript of Robert Atkin, April 15, 2008.)

Although the dispute appeared unresolved, no party interrupted the deposition to seek guidance from the court. Shortly after Ms. Lee's declaration above, when questioned about whether or not Dr. Atkin understood that he would have an ownership interest in the Patents-in-Suit at the time of the meeting with the attorneys at Carr & Ferrell in December 1998, the following exchange occurred

> ATKIN:   The – I didn't make that explicitly with the attorneys. I had talked about that with – and I said I think something like, you know, "I hope I'm going to be" – "my name is going to be on this" or something like that. I didn't get a – you know, agreement with the Reibers and the other people there.
> Q:   You –
> A:   I think those were my words. "I hope my name's on this too." and then I went ahead and wrote the whole thing up.

(Mot., Ex. D, Partial Deposition Transcript of Robert Atkin, April 15, 2008 at 156.) A few moments later, the following discussion was had

> Q  So you prepared a draft patent application and faxed it to Carr & Ferrell?
> A:  I'm not sure you would call it a draft patent application. I wrote up the technical part of it. And what we discussed during the meeting was that, you know, I was the technical guy. And they wanted me to write up all of the different ways that that patent could be – that invention could be implemented. They wanted me to think about all the different materials and all the different material configurations and all the possibilities of putting a – you know, a solid conducting core with semiconducting outside and, you know, all of the different ways of accomplishing the same thing.
> And then also not only the materials in the configurations but also all of the different ways of processing including, you know, heat treating and different environments and putting on additive coatings and doing all that other – all the other possible ways of achieving that result.

(*Id.* at 156-157.)

Both during and after this testimony, Ms. Lee remained mute, neither instructing the witness not to answer nor calling for a recess in the deposition. Shortly following this exchange an objection was raised by Ms. Lee, however her basis was "vague" — not because the information was privileged. (*Id.*)

The Reibers state they further made an objection to this line of testimony at the 2009 Atkin deposition and asked that Atkin's testimony be stricken, directing the Court's attention to their Response, Ex. A at pages 170-176. Unfortunately, the objection was made a year after Atkin's original testimony before the International Trade commission — long after the proverbial cat was out of the bag.

18

After extensively analyzing the issue of selective waiver of the attorney-client privilege, the Tenth Circuit has concluded that there is almost unanimous rejection of selective waiver among the circuits, the Eight Circuit being alone in affirming the application. *In re Qwest Communications Intern. Inc.*, 450 F.3d at 1187. The Tenth Circuit likewise rejected selective waiver of privileges. Therefore, to the extent that Atkins' testimony waived the attorney-client privilege with respect to the 1998 meeting in the context of the Trade Commission inquiry, the privilege is lost as to other litigations or cases as well.

The court finds that the testimony of Dr. Atkin cited above (Mot., Ex. D, Partial Deposition Transcript of Atkin, April 15, 2008 at 156-57) does constitute a waiver of the attorney-client privilege concerning what was discussed at the December 1998 meeting between Atkins, the Reibers and Carr & Ferrell. Dr. Atkin went into detail about what he was told at the meeting about his role in the process of applying for the Patents-in-Suit, his understanding about whether or not he was to be included as a co-inventor on the Patents-in-Suit, what technical expertise he was to apply to the documentation he would be drafting, and exactly what possible attacks to the Patents-in-Suit he should be preparing to address in his written product. This is far beyond a mere general statement of the nature of the meeting.

Wherefore, it is

**ORDERED**

Coorstek's Expedited Motion to Compel Dicovery (sic) of Communications Between Robert Atkin and Defendants' Patent Counsel" [Doc. No. 111] is **GRANTED**. Counsel are

**ORDERED** to arrange for the continued deposition of Dr. Atkin within sixty days of this Order and consistent with the scheduling dates applicable in the case.

Dated this 5th day of April, 2010.

**BY THE COURT:**

Kathleen M. Tafoya
United States Magistrate Judge