IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 08–cv–01133–KMT–CBS

COORSTEK, INC., a Delaware corporation,

      Plaintiff,

v.

STEVEN F. REIBER, and
MARY L. REIBER, individuals,

      Defendants and Counterclaimants,

v.

COORSTEK, INC., a Delaware corporation,

      Counterclaim Defendant.

---

**MEMORANDUM ON CLAIM CONSTRUCTION**

---

### I.    *Introduction*

By way of its complaint, CoorsTek, Inc. (hereinafter "CoorsTek") has sought a declaration

that four patents owned by Steven F. Reiber and Mary L. Reiber (hereinafter "the Reibers")

namely United States Patent No. 6,354,479 (Doc. No. 182 Ex. A-1; Doc. No. 184 Ex. B ['479

Patent]), United States Patent No. 6,651,864 (Doc. No. 182 Ex. A-2; Doc. No. 184 Ex. C ['864

Patent]), United States Patent No. 6,935,548 (Doc. No. 182 Ex. A-3; Doc. No. 184 Ex. E ['548

Patent]), and United States Patent No. 7,032,802 (Doc. No. 182 Ex. A-4; Doc. No. 184 Ex. D

['802 Patent]) (collectively "Patents-in-Suit"), have not been infringed by CoorsTek and additionally are invalid and/or unenforceable.  (*See* Doc. No. 63 [First Am. Compl.] at ¶¶ 7, 33-43.)  The Reibers, in their counterclaims, assert that CoorsTek, by its manufacture, use, offer for sale and sale of certain capillaries and bonding tools, infringe claims 19, 23, 32, 46-49 of the '479 Patent; claims 1 and 2 of the '864 Patent; and claim 1 of the '802 Patent.[1]  (Doc. No. 88 [April 2009 Joint Status Report].)

The '479 Patent, entitled Dissipative Ceramic Bonding Tip, was filed on February 25, 2000 and claims priority to Provisional Application No. 60/121,694, filed on February 25, 1999.

The '864 Patent, entitled Dissipative Ceramic Bonding Tip, was filed on December 31, 2001 as a continuation-in-part of the '479 Patent and claims priority to the '694 Application and Provisional Application No. 60/288,203, filed on May 1, 2001.

The '548 Patent, entitled Dissipative Ceramic Bonding Tool Tip, was filed on August 27, 2003 as a continuation of the '864 Patent and claims priority to the '694 Application and the '203 Application.

The '802 Patent, entitled Bonding Tool with Resistance, was filed on September 15, 2004 as a continuation-in-part of the '548 Patent and claims priority to the '694 Application, the '203 Application and Provisional Application No. 60/503,267, filed on September 15, 2003.

In general terms, the Patents-In-Suit are directed to tips of bonding tools for use in a bonding machine.  Bonding machines, as used in this context, weld delicate gold wire to semi-

---

[1] The Reibers do not assert any claim that the '548 Patent has been infringed by CoorsTek.

2

conductor chips and other sensitive electronic components such as computer hard drives.  A bonding tool is a removable item which is inserted into the bonding machine, similar to the relationship between a sewing machine and its needle.  The Reibers contend that their inventions enable the bonding process to occur on delicate electronic devices while avoiding damage caused by electrostatic discharge ("ESD").  (Doc. No. 184 [Def.C.C.Br.] at 7.)  The Patents-in-Suit assert that such damage is avoided because their patented dissipative tool tips conduct electricity at a rate sufficient to prevent electrostatic charge buildup, but are sufficiently resistant to electric current so as to prevent damage to the device being bonded.  ('479 Patent, cls. 1, 9, 19, 30, 37, 45, 46, 48, and 50; '802 Patent, cl. 1.)

CoorsTek has manufactured, used, sold and offered to sell bonding tools and capillaries made of certain materials identified as CZ1, CZ3, CZ6, and CZ8 (collectively "CZ materials"). (Doc. No. 74 [Reply to First Am. Ans. and Countercl.] at ¶ 15.)  The Reibers assert that the CZ material in CoorsTek's bonding tools and capillaries infringe certain claims of the Patents-in-Suit. (Doc. No. 72 [First Am. Ans. and Countercl.] at ¶¶ 4, 15.)  CoorsTek asserts, among other allegations, that it reconstituted the process of making CZ1, CZ3, CZ6, and CZ8 materials in 2008 and that these newly reformulated products do not infringe the Patents-in-Suit.  (Reply to First Am. Ans. and Countercl at ¶ 15.)

Present before the court are the parties' briefs on claim construction pursuant to *Markman v. Westview Instruments, Inc*., 52 F.3d 967 (Fed. Cir.1995) (*en banc*), *aff'd* 517 U.S. 370 (1996). (*See* Doc. Nos. 182, 184, 191 and 192.)  On February 15 and 16, 2011, the court heard scientific tutorials presented by the parties' experts and oral argument on claim construction.

## II.      Legal Issues and Standards

### A.      Person of Ordinary Skill in the Art

A court must construe claim terms from the perspective of a person of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (case initially arising from the District of Colorado). A "person of ordinary skill is a hypothetical person who is presumed to know the relevant prior art."  *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).  Prior art includes previous inventions or products which are "reasonably pertinent to the particular problem with which the inventor was involved."  *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535 (Fed. Cir. 1983).  "The person of ordinary skill is presumed to have access to the entire art not because he unrealistically carries the entire art in his head but because he knows how to find information in the art by researching accessible sources including the patent literature."  *In re Nilssen*, Case No. 88-1139, 1988 WL 32917, at *2 (Fed. Cir. Apr. 14 1988) (unpublished).  Factors to be considered in determining skill level include: "type of problems encountered in art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) (citing *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983)). Moreover, the actual inventor's skill is not determinative of the level of ordinary skill, because a person of ordinary skill is "presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate . . . ." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) (also noting that the concepts underling the Constitution

and the statutes that have created the patent system contemplate that inventors, as a class, possess

something which "sets them apart from workers of ordinary skill").

The parties initially disagreed regarding the qualifications of a person of ordinary skill in

the art in this case.  CoorsTek argued that "a person of ordinary skill in the art of the

semiconductor and integrated circuit industry would have a Bachelors [sic] degree of Science in

electrical engineering, solid state physics or materials science and 3-5 years of experience; a

Masters [sic] Degree of Science in electrical engineering, solid state physics or materials science

and 1-3 years of experience; or a high school education and 5 or more years of experience of

manufacturing or use of assembly equipment related to electrical overstress (EOS) and ESD

issues."  (Doc. No. 182 [Pl.C.C.Br.] at 8.)

The Reibers' definition of a person of ordinary skill in the art has metamorphosed over

time.  In response to CoorsTek's Interrogatory No. 9, the Reibers stated that "the pertinent level

of ordinary skill in the art is that of a person with skill and knowledge, acquired by approximately

four years of formal or informal education, training, or experience, in the field of bonding

electronic devices susceptible to electrical overstress (EOS) damage caused by electrostatic

discharge (ESD) during bonding, such as integrated circuits and disk drive components."  (Doc.

No. 191 [Pl.Resp.C.C.Br.) Ex. O at 4.)  However, in his report submitted in support of the

Reibers' proposed claim constructions, the Reibers' expert, Dr. Leo G. Henry, opined that "one

skilled in the field, during the relevant periods that the various Patents-in-Suit were filed, would

generally hold a Ph.D. [sic] in Material Science and Engineering, and 4-5 years experience in the

field of ESD."  (Doc. No. 185 [Henry Report] at ¶ 20.)  Dr. Henry continued, "Alternatively, one

skilled in the field would have at least a Master's degree in Physics, Materials Sciences and/or electrical engineering and also have at least 5-7 years of experience in the field of ESD." (*Id.*) Finally, at the scientific tutorial, the Reibers' expert also suggested that an individual whose experience is specifically dealing with ESD issues might be a person with ordinary skill in the art, but likely would need at least four years of experience in the specific field and need to become ESD certified.

During the claim construction arguments, the Reibers stated that Dr. Henry's testimony demonstrated little difference between the parties' proposed qualifications for a person of ordinary skill in the art. They also suggested that any difference in the definition was immaterial to the issues in the case as no evidence was presented to the court that a person with a Ph.D would interpret the claim terms differently than a person with a high school education and field experience.

While the court must consider claim construction from the perspective of a person of ordinary skill in the art, *Phillips*, 415 F.3d at 1313, the actual determination regarding the level of skill of a person of ordinary skill is a factual question. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966); *Custom Accessories*, 807 F.2d at 958. Because a person of ordinary skill is a hypothetical person, and because the Reibers have represented that they do not significantly disagree with CoorsTek's proposed definition for purposes of claim construction, the court concludes that it is neither necessary nor advisable for the court to specifically define the qualifications of a person of ordinary skill in the art at this stage. Moreover, the court's analysis and conclusions regarding construction of the claim terms presented would not differ whether the

6

court adopted the definition of a person of ordinary skill in the art proposed by CoorsTek or by the Reibers or at some point on the spectrum between the two.

### B.        *Principals of Construction*

Generally, a claim term is given its "ordinary and customary meaning," that being the definition given by "a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.  The Federal Circuit has explained that the claim construction inquiry begins by looking at the intrinsic evidence: the language of the claims, the specification, and the prosecution history.  *Id.*  The claims themselves, together with the use of a term within the claim, as well as other claims of the patent in question, both asserted and unasserted, and differences between and among claims "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.  It is appropriate for a court "to rely heavily" on the specification, including the patentee's written description, for guidance as to the meaning of the claims.  *Id.*  In fact,

> the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."

*Id.* at 1315 (*quoting Vitrionics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.1996)).

The court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980.  Though less useful and often lacking the clarity of the specification, "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim's scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

Apart from intrinsic evidence, the court is also authorized to rely on extrinsic evidence, that being "evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quotation omitted).  Such evidence, while "shed[ding] useful light on the relevant art," is "less significant than the intrinsic record in determining the legally operative meaning of claim language," and "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1317, 1319.

If at all possible, a patent should be construed by the court so as to sustain its validity. *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993).

### C.    *Claims to be Construed*

#### 1.    *Construction of Terms Not Contained in Infringement Claims*

The parties disagree, in part, about which claim terms this court must construe.  While there is agreement that construction of terms contained in the Reibers' claims of infringement must be addressed, CoorsTek also argues that claims which are not part of the infringement allegations should be construed pursuant to its declaratory judgment complaint.  The parties agree that the following terms submitted for construction appear in the infringement claims:  "resistive material," "in the range of $10^5$ to $10^{12}$ ohms," "tip; bonding tip; bonding tool tip; tip of a bonding tool," "dissipative material; dissipative ceramic; electrically dissipative," and "resistance low enough to prevent a discharge of charge to a device and high enough to avoid current flow large enough to damage said device being bonded."  The terms which do not appear in the Reibers' infringement claims include: "high enough stiffness to resist bending when hot," "high enough

8

abrasiveness so as to function for at least two uses," "high enough abrasiveness so as to function for at least 30, 000 uses," "insulating core," "conducting core," "static discharge time," and "essentially smooth current." CoorsTek argues that, because the court properly has jurisdiction over CoorsTek's declaratory judgment action, "[t]he Reibers' tactical decision not to attempt to enforce certain patent claims . . . does not divest this Court's subject matter jurisdiction . . . vis a vis other claims in the Patents-in-Suit or eliminate the need for the Court to construe disputed terms contained in [currently] unasserted claims." (Pl.Resp.C.C.Br. at 5.)

The Declaratory Judgment Act provides that, "[in] a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Act's case or controversy requirement for declaratory judgment jurisdiction is the same case or controversy requirement found in Article III of the Constitution. *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239-41 (1937). The Supreme Court has explained that "[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation omitted).

Until recently, the Federal Circuit applied a two-prong test to determine the existence of declaratory judgment authority in the patent context:

> The first prong examined whether conduct by the patentee created a reasonable apprehension of suit on the part of the declaratory judgment plaintiff. The second prong focused on the declaratory judgment plaintiff's conduct, and examined whether there had been meaningful preparation to conduct potentially infringing activity.

*Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 879 (Fed. Cir. 2008). In 2007, the Supreme Court rejected the first prong of this standard, holding that the existence of an Article III controversy "must be determined based on all the circumstances, not merely on whether the declaratory judgment plaintiff is under reasonable apprehension of suit." *Id.* at 879-80 (citing *MedImmune*, 549 U.S. at 126-37).

Today, declaratory judgment jurisdiction exists "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license." *Hewlett-Packard Co. v. Acceleron, LLC*, 587 F.3d 1358, 1361 (Fed. Cir. 2009) (citing *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007)). If a party has actually been charged with infringement, "there is, *necessarily*, a case or controversy adequate to support declaratory judgment jurisdiction." *Id.* at 1362 (emphasis in original) (quotation omitted). In the absence of an infringement action, "conduct that can be reasonably inferred as demonstrating intent to enforce a patent can create declaratory judgment jurisdiction." *Id.* at 1363. Moreover, the second prong of the Federal Circuit's declaratory judgment standard—whether there has been meaningful preparation to conduct potentially infringing activity—"remains an important element in the totality of circumstances which must be considered in determining whether a declaratory judgment is appropriate." *Cat Tech*, 528 F.3d at 880.

In the context of disputed claim construction in a patent case, the existence of a case or controversy must be evaluated on a claim-by-claim basis. *See Jervis B. Webb Co. v. S. Sys., Inc.*, 742 F.2d 1388, 1399 (Fed. Cir. 1984). Thus, there must be evidence of a controversy as to each claim in the patent on which the court is asked to declare judgment. *See id.* at 1399-1400 (reversing district court's finding of obviousness as to 6 of the 12 claims in the patent because there was no case or controversy between the parties as to those claims)*; see also Emerson v. Nat'l Cylinder Gas Co.*, 251 F.2d 152, 157-58 (1st Cir. 1958) (affirming dismissal of counterclaim seeking a judgment declaring certain claims of the patent invalid, certain other claims of which were at issue in the suit, because the district court properly found no actual controversy existed between the parties as to the claims involved in the counterclaim); *Lam, Inc. v. Johns-Manville Corp.*, 206 U.S.P.Q. 452, 465-66 (D. Colo. 1979) (refusing to reach declaratory judgment counterclaims because the counterclaimant had never manufactured the items that were the subject of those claims).

CoorsTek alleges

On September 10, 2007, Defendants filed a patent infringement and trade secret misappropriation lawsuit against a number of hard disk drive manufacturers, including two of CoorsTek's customers, captioned *Reiber v. Western Digital Corp.*, et al., Case No. 2:07-cv- 01874 (E.D. Cal.), and initiated a proceeding before the United States International Trade Commission ("ITC") alleging patent infringement against the same manufacturers, *In re Certain Hard Disk Drives, and Certain Components Thereof*, Inv. No. 337-TA-616 (U.S.I.T.C.) (collectively the "Prior Litigation"). In the Prior Litigation, Defendants alleged, *inter alia*, that CoorsTek's customers, infringed the Patents-In-Suit by, among other things, importing products manufactured by using CoorsTek bonding tools. As a result of Defendants' claims in the Prior Litigation against CoorsTek's customers, CoorsTek received demands for indemnification from its customers. Believing that it did not infringe any valid claim of any patent held by the Reibers, and that

> the claims of the Patents-in-Suit were invalid and/or unenforceable, CoorsTek
> initiated this Declaratory Judgment Action, seeking a declaration of
> non-infringement, invalidity, and unenforceability on each and every claim of the
> Patents-in-Suit.

(Pl.C.C.Br. at 3.)  CoorsTek filed this declaratory judgment action "seeking a declaration of non-infringement, invalidity, and unenforceability on each and every claim of the Patents-in-Suit." (*Id.*)  There is clearly "a substantial controversy, between parties having adverse legal interests" as the Reibers have brought counterclaims for infringement of certain claims in the Patents-in-Suit.  *MedImmune*, 549 U.S. at 127.

There is no dispute that CoorsTek is currently involved in the manufacture and selling of bonding tools.  (*See* Reply to First Am. Ans. and Countercl. at ¶ 15.)  Under these circumstances, there is certainly "identified ongoing or planned activity" in which CoorsTek "contends that it has the right to engage in the accused activity without license."  *Hewlett-Packard Co.*, 587 F.3d at 1361.  Therefore, the court will consider construction for the remainder of the submitted claims to the extent otherwise appropriate.

> **2.**     ***"Extrinsic semiconducting material which has dopant atoms; doped semiconductor"***

The parties initially identified thirty claim terms requiring judicial construction.  (*See* April 2009 Joint Status Report.)  Absent from those thirty claim terms was a request to construe the term "extrinsic semiconducting material which has dopant atoms; doped semiconductor" ("the dopant atoms term").  On October 13, 2010, however, the parties submitted their final Joint Proposed Claim Construction Statement (Doc. No. 178 [October 2010 Joint Prop. Cl. Constr. Stmt.]) which was the first and only time the dopant atoms term appeared.  Thereafter, neither

CoorsTek nor the Reibers briefed or argued the construction of the dopant atoms term.  Therefore, the court concludes that the request to construe the dopant atoms term has been abandoned and it will not be further addressed herein.

### 3.    *Device*

A request for construction of the term "device" appeared in both the April 2009 Joint Status Report and the October 2010 Joint Proposed Claim Construction Statement.  Again, however, neither party briefed or argued a specific construction of this term.[2]  In the context of these patents, the term device is non-technical, is in plain English and the jury will have no trouble determining to what the term "device" refers in the context of this case.  There is no need for the court to function as a thesaurus and to do so usurps the province of the jury.  *See, e.g.*, *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is not meant to be an obligatory exercise in redundancy.)  As noted by the Federal Circuit in *Phillips*, "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  415 F.3d at 1314.  This court finds that replacing the word "device" with CoorsTek's complicated construction in lieu of its common and everyday usage is contrary to the purposes of claim

---

[2] CoorsTek mentioned the term "device to be bonded" as a subpart of its requested construction of "resistance low enough to prevent a discharge of charge to a device and high enough to avoid current flow large enough to damage said device being bonded."  (*See* Pl.C.C.Br. at 24-25.)  Without argument or support, CoorsTek simply adopted the cumbersome definition ascribed by its expert, to wit, "any active or passive electronic component that may be electronically or electrically connected to another component."  (*Id.* at 25.)

construction.  Since no party briefed in detail a specific construction for the term "device," the

court will deem the request for further judicial construction of the term device" to have been

abandoned as well.  However, to the extent the request for construction of the term "device" was

not abandoned, the court finds it unnecessary to provide further construction of this term.

### 4.    Terms Within Disclaimed Claims

On April 13, 2010, the U.S. Patent and Trademark Office ("PTO") published statutory

disclaimers filed by the Reibers disclaiming any right to claims 5-13 of the '802 Patent, and on

June 15, 2010, published statutory disclaimers filed by the Reibers disclaiming any right to

claims 20-22, 25-31, 33-36, and 40-45 of the '479 Patent, and claims 8-27 and 39-78 of the '864

Patent.  (*See* Pl.C.C.Br. at 4 n.2.)  The court has noted the disclaimed claims for each construction

undertaken; however, since as to each disputed claim term there remain instances of the term

occurring in still active claims, the disclaimers have little effect on the court's claim

constructions.

### III.    Analysis and Construction of Claim Terms

#### A.    Stipulated Term

## 1.    Resistance

The term "resistance" appears in the '479 Patent, claims 1-9, 19, 30, 37, 45, 46, 48, 50;

the '864 Patent, claims 1-4, 7, 8, 16, 17, 24, 25, 27-29, 31, 33-35, 37; the '548 Patent, claims 1-3;

and the '802 Patent, claims 1-13.  The parties agree to the following construction: resistance is

"opposition to electrical current flow."  (October 2010 Joint Prop. Cl. Constr. Stmt. at 2.)

14

### B.    Disputed Terms

**2.    Dissipative Terms[3]** – "electrically dissipative;" "dissipative material;" "dissipative ceramic"
   **'479 Patent:** claims 1, 5, 9, 19, 23-24, 46-48, 50
   **'864 Patent:** claims 1, 4
   **'548 Patent:** claim 1

| CoorsTek's Construction | Reibers' Construction |
|---|---|
| a material having a surface resistivity of at least $1 \times 10^5$ ohms/square but less than $1 \times 10^{12}$ ohms-cm or having a volume resistivity of at least $1 \times 10^4$ ohm-cm but less than $1 \times 10^{11}$ ohms-cm | a material having an electrical resistance between that of insulative and conductive materials |

**3.    "Resistive Material"[4]**
   '479 Patent: claims 1, 5, 9, 19, 23-24, 46-48, 50
   '864 Patent: claims 1, 4
   '548 Patent: claim 1
   '802 Patent: claims 1, 2

| CoorsTek's Construction | Reibers' Construction |
|---|---|
| a material that has a volume resistivity or surface resistivity greater than zero | a material that opposes or resists electrical current flow |

This court will construe the dissipative terms and the resistive material term together because the applicable analysis is similar.

---

[3] As noted in Section II.C.4 herein, the Reibers have disclaimed the following claims in the Patents-in-Suit which also contain the disputed terms: '479 Patent, cls. 25-27, 29-31, 35, 42, and 44-45; and '864 Patent, cls. 9, 18, and 26.

[4] As noted in Section II.C.4 herein, the Reibers have disclaimed the following claims in the Patents-in-Suit which also contain the disputed terms: '479 Patent, cls. 25-27, 29-31, 35, 42, and 44-45; '864 Patent, cls. 9, 18 and 26; and '802 Patent, cls. 5, 6, 8 and 11.

The Reibers' construction of the dissipative and resistive terms are based upon the intrinsic definition contained in the Patents-in-Suit and the parties' agreement as to the meaning of the term resistance.  CoorsTek argues that "dissipative," as it applies to electrical properties, is a technical term which can or should be defined by reference to extrinsic evidence.  The *Phillips* court stated,

> The court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.  Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

415 F.3d at 1314.  CoorsTek's proposed construction depends upon adoption of a term which is not contained in the Patents-in-Suit—"resistivity"—and reliance upon extrinsic evidence as to the parameters of resistivity and its mathematical calculation.  (Pl.C.C.Br. at 17-23.)

Both parties' experts agree, and the "ESD Association Advisory for Electrostatic Discharge Glossary" ("ESD Glossary") concurs, that surface resistance and surface resistivity are two related, but different, quantifications of electrical properties.  (*See* Pl.C.C.Br. Ex. A [Blanchard Report] at 12; Henry Report at 7; Pl.C.C.Br. Ex. A-16 [ESD Glossary] at 12.)  The ESD Glossary defines "surface **resistance**" as

> The ration of DC voltage to the current flowing between two electrodes of specified configuration that contact the same side of a material.  This measurement is expressed in ohms.  (ESD-ADV 1.0-1994).

(ESD Glossary at 12.)  The ESD Glossary definition for the term "surface **resistivity**" follows immediately thereafter.

For electric current flowing across a surface, the ration of DC voltage drop per unit length to the surface current per unit width.  In effect, the surface resistivity is the resistance between two opposite sides of a square and is independent of the size of the square or its dimensional units.  Surface resistivity is expressed in ohms/square.  When using a concentric ring fixture, resistivity is calculated by using the following expression, where D1=outside diameter of inner electrode, D2=inside diameter of outer electrode, and R=measured resistance in ohms.

$$\text{Surface Resistivity} \quad \rho_s = \left[ \frac{2\pi}{\ln(D2 \, / \, D1)} \right] R$$

(*Id.* at 13.)  Surface resistivity, then, is an equation wherein one of the parameters needed to perform the surface resistivity calculation is the measured resistance.

The term "resistivity" or "surface resistivity" does not appear in any of the Patents-in-Suit, either in claims, embodiments or specifications.  Instead, the patentee consistently refers to resistance measurements and expresses specific embodiments in terms of ohms, not ohms/square. Since the two concepts are admittedly different, the reasonable inference is that a person of ordinary skill in the art would understand that the Patents-in-Suit purposefully defined the scope of the inventions in terms of resistance and that the term "resistivity" was purposefully rejected as an applicable concept.

CoorsTek argues that "material" can only be measured in terms of resistivity and not in terms of resistance.  (Pl.C.C.Br. at 18-19.)  Apparently, the experts for both sides agree that, in general, resistivity is a property of a material and resistance is an electrical property of an object. (Blanchard Report at 12-13; Henry Report at 7, 12.)  The patents, however, involve the properties

of an object, the bonding tool, in relation to a device being bonded, measured at a certain location on the object.[5]

The prosecution history of the '479 Patent supports the rejection of the concept of "resistivity" being applied to the Patents-In-Suit.  In a May 24, 2001 Response to an Office Action, the patentee explained to the Examiner the importance of his specific distinction between resistance and resistivity as applied to his patent application while distinguishing prior art known as "Matcovich, et al."  (*See* Def.C.C.Br. Ex. G.)  The patentee stated, "the 'resistance' of Matcovich et al. is given in units of ohms per square whereas the resistance of the ['479 Patent] claims is given in ohms."  (*Id.* at 9-10.)  The patentee explained that, although prior art Matcovich et al. used the term "resistance," that prior art actually employed a calculation resulting in ohms per square thus defining resistivity, not resistance.  (*Id.*)  The patentee summarized the differences between the concept of "resistivity" and "resistance" as used in his '479 Patent by stating

> Resistivity and specific resistance referred to by the Examiner are not the same as resistance.  The units ohms-cm and ohms per square referred to by the Examiner are not the same as the unit ohms.

(*Id.* at 22 (underlining in original); *see also* the patentee's express distinctions between resistance and resistivity, *id.* at 15, 18.)

CoorsTek's reliance upon extrinsic evidence to support importing a new term—one specifically rejected by the patentee during the prosecution—into the Patents-in-Suit is inappropriate since this extrinsic evidence flatly contradicts the intrinsic evidence as noted.

---

[5] This location or tip is addressed in the following section.

*Phillips*, 415 F.3d at 1317.  The court rejects attempts in construction of these terms, as well as in other disputed claims, to replace the concept of resistance as used in the Patents-in-Suit with the term "resistivity" which would be in direct contravention of the prosecution history and the language of the Patents-in-Suit themselves.

In addition to attempting to graft a new term onto the Patents-In-Suit to define the dissipative terms and the resistive material term, CoorsTek also implores this court to define the disputed terms with greater mathematical precision, again based on the rejected computation of resistivity.  In addition to rejecting parameters for claim terms based on "resistivity," the court also notes, "It is usually incorrect to read numerical precision into a claim from which it is absent, . . . "  *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1551 (C.A. Fed. 1996) abrogated on other grounds by *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed. Cir. 2000) (*en banc*) *rev'd on other grounds,* 535 U.S. 722 (2002).

The terms "electrically dissipative;" "dissipative material;" "dissipative ceramic" are therefore construed as follows: "dissipative means having an electrical resistance in the range between completely insulative and completely conductive, excluding both endpoints."

The term "resistive material" is construed as follows: "resistive means opposing or resisting electrical current flow."

***4.     "Tip; bonding tip; bonding tool tip; tip of a bonding tool"[6]***
'479 Patent: claims 1-9, 19, 37, 46, 48, 50
'864 Patent: claims 1-4, 7, 28, 29, 31, 33-35, 37
'548 Patent: claims 1-3
'802 Patent: claim 1-4

| CoorsTek's Construction | Reibers' Construction |
|---|---|
| Not susceptible to reasonable construction because the phrases are used interchangeably in the specifications of the Patents-in-Suit to reference the output end of a bonding tool and/or a bonding tool as a whole. | End of a bonding tool.  Bonding tool is a tool that uses heat, pressure and/or ultrasonic energy to weld metals. |

The parties are in substantial agreement about the definition of a bonding tool.  CoorsTek has asserted that for the purposes of the Patents-in-Suit, the term bonding tool "would refer to a tool used in a bonding machine that uses heat, pressure and/or ultrasonic energy to connect wires to a bonding pad." (Pl.C.C.Br. at 2 n.2.)  CoorsTek also states that "similar to a sewing machine needle and a sewing machine, bonding tools are used in bonding machines to connect minuscule gold wires between bonding pads in the manufacturing of some electronic components."  (*Id.*) The Reibers similarly construe "bonding tool" to mean a "tool that uses heat, pressure and/or ultrasonic energy to weld metals."  (Def.C.C.Br. at 20-22.)

CoorsTek's construction argument as to the bonding tip terms centers on the premise that "tip; bonding tip; bonding tool tip; tip of a bonding tool" all refer to an item which is a discrete part or segment of a bonding tool.  CoorsTek asserts that the terms "tip; bonding tip; bonding tool

---

[6] As noted in Section II.C.4 herein, the Reibers have disclaimed the following claims in the Patents-in-Suit which also contain the disputed terms: '479 Patent, cls. 30 and 45; '864 Patent, cls. 8, 16, 17, 24, 25, and 27; and '802 Patent, cls. 5-13.

tip; tip of a bonding tool" are used interchangeably to mean variously "the output end of a bonding tool; some portion of the bonding tool including the output end; and the entire bonding tool." (Pl.C.C.Br. at 8-9.) CoorsTek argues that nothing in the intrinsic or extrinsic evidence defines how to determine the beginning and end points of a "tip" as opposed to the entire bonding tool, and, therefore, the court should invalidate the claims for indefiniteness. (Id. at 9.) The Reibers' construction is that the "tip; bonding tip; bonding tool tip; tip of a bonding tool" is the end of the bonding tool. The Reibers argue that a person of ordinary skill in the art would understand what is meant by "tip," in the various iterations of the disputed terms, including the relevant dimensions "which may vary depending on the tool type and size." (Reply at 13.)

As described in the Patents-in-Suit, a computer chip consists of an electrical component (the integrated circuit) that is mounted on a lead frame. As part of the manufacturing process, individual leads on the lead frame are connected to individual bonding pads on the integrated circuit with wire welds or bonds. (*See generally* '479 Patent, col. 1, ll. 15-39.) The thin gold wire used in the process is fed through a tubular object called a bonding tool. (*Id.*) An electrical discharge at the point where the bonding tool, wire, lead and the integrated circuit's bonding pad come closest to contact—supplied by a separate device attached to the bonding machine—melts a bit of the wire, forming a bonding ball that attaches the lead to the bonding pad. (*Id.*) The Patents-in-Suit sought to address a perceived problem with the bonding process caused by electrostatic discharge at the point of creation of the bond which could damage the integrated circuit or other device being bonded.



A bonding tool is a very small article. Figure 1, appearing in each of the Patents-in-Suit, depicts a bonding tool with a pointed end, looking much like a sharpened pencil in the drawing, but obviously infinitely smaller in reality. All four of the Patents-in-Suit describe Figure 1 as "illustrat[ing] a typical capillary bonding tool **10**. Such bonding tools are usually about one-half inch (12-13 mm) long and about one-sixteenth inch (1.6 mm) in diameter."

('479 Patent, col. 1, ll. 1-3; *see also* '864 Patent, col. 3, ll. 48-51; '802 Patent, col. 3, ll. 28-31.)

To support its argument, CoorsTek asserts that in using the terms "tip; bonding tip; bonding tool tip; tip of a bonding tool," the inventor confused the contested terms with the entire bonding tool, creating unacceptable ambiguity.  Specifically, CoorsTek argues, "Defendants interchange the term 'bonding tool tips' with 'tools'" and then cites to the following language appearing in the Patents-In-Suit:

> In the present invention, *bonding tool tips* with the desired electrical conduction can be made with three different configurations.
>> First, *the tools* can be made from a uniform extrinsic semiconducting material …
>> Second, *the tools* can be made by forming a thin layer of high doped semiconductor on an insulating core …
>> Third, *the tools* can be made by forming a lightly doped semiconductor layer on a conducting core …

(Pl.C.C.Br. at 11-12 (emphasis added) (citing '479 Patent, col. 2, ll. 16-20, 27-28, 35-36 and col. 4, ll. 27-32, 38-39, 47-48; '802 Patent, col. 2, ll. 30-34, 40-42, 50-52).)  CoorsTek's also cites the '479 Patent:

> Typical *bonding tips* on the market today are made of an insulator of alumina (Al2O3), sometimes terms [sic] aluminum oxide. This very hard compound which has been used on commercial machines with success as it provides a reasonably long life in use as a *wire bonding tool*. To insure that it is an insulator no conductive binders are used in *these bonding tips*. However, as stated previously, the problem has existed that an electrostatic discharge from the *bonding tool* making contact with the bonding pad of the desired circuit can damage the very circuit it is wiring up.

(Pl.C.C.Br. at 12 (emphasis added) (citing '479 Patent, col. 3, ll. 56-62).)  CoorsTek asserts that the location of the disputed terms "in sections of the specification that the describe the invention as a whole suggests that 'bonding tips' refer to the entire bonding tool."  (*Id.* at 12.)

The Reibers claim that bonding tools are homogenous throughout; thus, in discussing the properties of the "tip" it is not inconsistent to discuss the properties of the entire tool. Specifically, the Reibers cite to language in the specifications of the '548 and the '864 Patents describing examples of methods for manufacturing dissipative tools, where mixes of powders are molded, and heated slowly "so as to obtain low porosity, and obtain homogeneity."  ('548 Patent, col. 7, ll. 43-47; '864 Patent; col. 7, ll.33-37.)

The extrinsic evidence supports the idea of homogeneity.  Dr. Henry stated that "[n]aturally, the tip of the bonding tool is made of the same material as the entire bonding tool"and indicated that he was "unaware of the manufacture of bonding tools where the tip or end of the bonding tool is made from a different material than the rest of the bonding tool."  At his deposition, Dr. Blanchard similarly indicated that he could not remember any specific tool where the material at the top or middle of the tool was different from the material at the bottom.  (D's

Reply , Ex. B. [Blanchard Depo.] at 78:4-19 (stating that he thought he remembered one but could not remember the details).)

It is clear to the court, that in these sections of the Patents-in-Suit use a vernacular reference common in the industry at the time by referring interchangeably to a bonding tool and a bonding tip.  The sections of the Patents-in-Suit describing three different configurations of bonding tool tips explains that the composition of the tool as a whole will affect the electrical properties of different parts of the tool, including the location variously described as the "tip; bonding tip; bonding tool tip; tip of a bonding tool."

There appears to be some relationship between using the vernacular reference of "bonding tip" or "bonding tool tip" when referring to the function of the bonding tool as a small component of the bonding machine.  While certain diagrams appearing in the Patents-in-Suit show only the bonding tool, Figures 6(a) and 6(b)depict the tool in relationship to the machine, giving insight into the occasional reference to the whole tool as a "bonding tip."



Transducer Horn Tip and Wedge Deta

*FIG. 6B*



*FIG. 6A*

24

The phrase "on the market today" clearly indicates a whole product, not a segment or piece of a product.  Again, this language, intrinsic to the patent, clearly anticipates that "bonding tip" is simply a location of a bonding tool and, in a homogenous item, reference to the tip implicates the whole tool.  This is why the composition of the whole bonding tool is important to gaining "long life in use" for any specific location on the tool, including the tip.  (*Id.*)

Further, in the Notice of Allowance generated as part of the prosecution history of the '479 Patent, the Examiner concluded that the '479 Patent was allowable because:

> Electrically dissipative materials such as dissipative ceramics are known in the art [] as materials which may be formed and shaped into tools. However, there is no disclosure of using such a material to form *a wire bonding tip*.  *Such tools* are typically insulating [] or conducting [] rather than dissipative.

(Pl.C.C.Br. Ex. G [Notice of Allowability] at 2 (emphasis added).)  The Examiner directly referenced a *bonding tool* as the instrument being discussed, but in the same sentence referred to the invention as a "*wire bonding tip*."

A patentee is free to be his own lexicographer.  *Markman*, 52 F.3d at 980 (*citing Autogiro Co. v. United States*, 384 F.2d 391, 397 (Ct. Cl. 1967)).  "The caveat is that any special definition given to a word must be clearly defined in the specification."  *Id*.  In this case, both the Examiner and the patentee interchangeably used the terms bonding tool and the various iterations of "bonding tool tip."  The bonding tool itself is a very small, relatively sharp replaceable part on a bonding machine.  There is no ambiguity as to what is meant in the Patents-in-Suit by "tip; bonding tip; bonding tool tip; tip of a bonding tool" when read in context.

Accepting this interpretation, the language throughout the Patents-in-Suit is therefore consistent and unambiguous.  The court finds that a person of ordinary skill in the art would understand from the context of the patent the difference between the bonding tool and the "tip; bonding tip; bonding tool tip; tip of a bonding tool."

Coorstek further argues that nothing in the Patents-in-Suit explains how to determine the beginning and end points of a "tip" as opposed to the entire bonding tool, and therefore urges the court to invalidate the claims for indefiniteness.  Using Figure 1, the Patents-in-Suit also describe the bonding tool tip.  The '479 Patent states, "The bonding tool tip **12** itself is usually from 3 to 10 mils (0.08 to 0.25 mm) long."  ('479 Patent, col. 3, ll. 5-7.)  Both the '864 and '548 Patents state, "The bonding tool tip **12** can be from 1 to 8 mils, 2 to 6 mils, or 3 to 10 mils (0.08 to 0.25 mm) long."  ('864 Patent, col. 3, ll. 51-53.)  Finally, the '802 Patent states,  "A bonding tool tip **12** is, in exemplary embodiments, 3 to 10 mils (e.g., 0.08 to 0.25 mm) long."  ('802 Patent, col. 3, ll. 32-34.)

Figure 2 is also contained in all four Patents-in-Suit.  It depicts

a highly enlarged, cross-sectional view of the capillary bonding tool **10** as shown and described in FIG. **1**.  Only that portion of the bonding tool 10 shown within the dotted circle in FIG. **1** is shown in FIG. **2**.  Tool tip **12** has the hole tube **14** which may run the entire length of the bonding tool **10**.  The exit whole **18** is where the wire (not shown) would exit the tool tip **12**.

('479 Patent col. 3, ll. 11-17; *see also* '864 Patent, col. 3, ll. 1-3 & '548 Patent, col. 3, ll. 9-11

("FIG.**2** is a vastly enlarged cross-sectional view of a capillary-type construction of the operating end or tip of a bonding tool"); '802 Patent, col. 3, 11 65-67 ("FIG.**2** is an enlarged cross-sectional

view of the capillary-type construction of the operating end or tip of the bonding tool of FIG. **1**”).)

Patent claims should generally be construed to encompass the preferred embodiments described in the specification, and it is generally error to adopt a construction that excludes them. *See On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004).  Limitations from the specification (such as from the preferred embodiment), however, may not be read into the claims absent the inventor's express intention to the contrary.  *Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002); *see also CCS Fitness, Inc. v. Brunswick Corp*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (“[A] patentee need not ‘describe in the specification every conceivable and possible future embodiment of his invention.’”) (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)).  The various embodiments of the Patents-in-Suit do provide measurements for the bonding tool tip and therefore the claims are not indefinite.  However, the court declines to incorporate the limitations from the embodiments into the claim terms.  A person of ordinary skill in the art would understand from the intrinsic evidence what is meant by “tip; bonding tip; bonding tool tip; tip of a bonding tool.”  This court therefore finds, from the intrinsic evidence in the Patents-in-Suit, that the terms “tip; bonding tip; bonding tool tip; tip of a bonding tool” all generally refer to a location on a bonding tool, thus implicating the bonding tool as a whole.  The same terms are also used to refer to the whole bonding tool.  The court construes the terms “tip; bonding tip; bonding tool tip; tip of a bonding tool” to mean the output end of a bonding tool.

**5.**     ***"Insulating core" and "Conducting core"***[7]
   '479 Patent: claims 6, 7 (insulating core)
   '479 Patent: claims 8, 9 (conducting core)

| CoorsTek's Construction | Reibers' Construction |
|---|---|
| insulating core: | insulating core: |
| a form upon which insulative material, defined as a material having surface resistivity of at least $1 \times 10^{12}$ ohms/square or a volume resistivity of at least $1 \times 10^{11}$ ohms-cm is deposited | a core formed from insulative material |
| conducting core: | conducting core: |
| a form upon which conductive material, defined as a material having surface resistivity of more than zero and less than $1 \times 10^5$ ohms/sq or a volume resistivity of more than zero and less than $10^4$ ohms-cm is deposited | a core formed from conductive material |

CoorsTek's construction of the two terms above suffers from the same disability as its previous definitions—the constructions improperly import resistivity calculations into the Patents-in-Suit in contravention of the intrinsic evidence indicating resistance to be the proper measurement.  For all the reasons set forth in detail *supra*, the court rejects CoorsTek's attempt to define claim terms based solely on extrinsic evidence which contradicts and overrides the intrinsic evidence.

---

[7] As noted in Section II.C.4 herein, the Reibers have disclaimed the following claims in the Patents-in-Suit which also contain the disputed terms: '479 Patent, cls. 27, 28, 42 and 43 (insulating core); '479 Patent, cls. 29-30, 44 and 45 (conducting core); '802 Patent, cls. 8 and 9 (insulating core); and '802 Patent, cls. 11 and 12 (conducting core).

The '479 patent provides, when discussing the appropriate resistance, "The resistance should be low enough so that the material is not an insulator, not allowing for any dissipation of charge and high enough so that it is not a conductor, allowing a current flow." ('479 Patent, col. ll. 9-12.)  Therefore, based on the intrinsic evidence contained in the Patents-in-Suit, the court construes the terms as follows: "Insulating core is a core formed of material which does not allow for any dissipation of electrical charge.  Conducting core is a core formed from material which allows an electrical current flow."

**6.    *"Resistance low enough to prevent a discharge of charge to a device and high enough to avoid current flow large enough to damage said device being bonded"*[8]**

‘479 Patent: claims 1, 9, 19, 37, 46, 48, 50
‘802 Patent: claim 1[9]

| CoorsTek's Construction | Reibers' Construction |
| --- | --- |
| unable to ascertain a well bounded definition  within the parameters of low enough to prevent the flow of electrons through the bonding tip to the active or passive electronic component and high enough to avoid electrical current flow to damage the active or passive electronic component | No construction is required |

Again, the parties are in agreement about the definition of resistance.  Resistance is

"opposition to electrical current flow."  (October 2010 Joint Prop. Cl. Constr. Stmt. at 2.)  So,

substituting the agreed construction for the first word of the contested language, the phrase would

read, "opposition to electrical current flow low enough to prevent a discharge of charge to a

device and high enough to avoid current flow large enough to damage said device being bonded."

---

[8] As noted in Section II.C.4 herein, the Reibers have disclaimed the following claims in the Patents-in-Suit which also contain the disputed terms: ‘479 Patent, cls. 30 and 45.

[9] The parties, in their 2010 Joint Proposed Claim Construction Statement, indicate that the term to be construed appears in the ‘802 Patent, claim 1, as well as in the ‘479 Patent.  The precise phrase in dispute according to the parties, however, does not appear in the ‘802 Patent, claim 1.  Instead, the term in the ‘802 Patent metamorphosed into, "resistance low enough to *discharge a small voltage in a device being bonded at a rate of less than 5 milliamps of current* and high enough to avoid current flow large enough to damage the device being bonded." (‘802 Patent, col. 7, ll. 13-16 (emphasis added to highlight changed language).)  The court, therefore, only considers the second part of the contested phrase, "high enough to avoid current flow large enough to damage the device being bonded," in connection with the construction in the ‘802 Patent.

CoorsTek takes issue with the terms low enough, high enough and large enough.  (*See* Pl.C.C.Br. at 25-27 & n.7.)  The court finds that every other term in the phrase appears clear on its face in light of the other constructions herein.

Low enough, high enough and large enough are terms of degree.  When construing a term of degree, a key question is whether the intrinsic evidence provides some standard for measuring that degree.  *Exxon Research and Eng'g v. United States*, 265 F.3d 1371, 1381 (Fed. Cir. 2001).

The first place the term appears is in claim 1 of the first patent, the '479 Patent. Therefore, the court looks first to the specifications in that patent for the meaning of the terms. The abstract of the '479 Patent, in describing the invention states,

> In accordance with the principles of the present invention, to avoid damaging delicate electronic devices by any electrostatic discharge, an ultrasonic bonding wedge tool tip must conduct electricity at a rate sufficient to prevent charge buildup, but not at so high a rate as to overload the device being bonded.  For best results, a resistance in the tip assembly itself should range from $10^5$ to $10^{12}$ ohms.

('479 Patent, abstract.)

> In describing the prior art, the inventor states,

> Certain prior art devices have a one or more volt emission when the tip makes bonding contact.  This could present a problem, as a one volt static discharge could generate a 20 milliamp current to flow, which, in certain instances, could cause the integrated circuit to fail due to this unwanted current.

('479 Patent, col. 1, ll. 48-53.).  This section sets at least one parameter for the current flow at lower than 20 milliamps.  *See Glaxo Group Ltd. v. Ranbaxy Pharms, Inc*., 262 F.3d 1333, 1337 (Fed. Cir. 2001) (a standard for measuring a term of degree may come from the applicant's statements distinguishing the prior art).  Further, the summary section of the patent provides, "It

is desirable for the bonding tip to discharge slowly.  The tip needs to discharge to avoid a sudden

surge of current that could damage the part being bonded."  ('479 Patent, col. 2, ll. 6-9.)

> The specification in the patent provides:
>
> In accordance with the principles of the present invention, to avoid damaging
> delicate electronic devices by this electrostatic discharge, a bonding tool tip must
> conduct electricity at a rate sufficient to prevent charge buildup, but not at so high
> a rate as to overload the device being bonded.  It has been determined that the tool
> must have electrical conduction greater than one ten-billionth of a mho (i.e.>1x10
> raised to the minus 12th power reciprocal ohms) but its electrical conductivity
> must be less than one one-hundred thousandth of a mho (i.e. <1x10 raised to the
> minus fifth power reciprocal ohms.)  The resistance should be low enough so that
> the material is not an insulator, not allowing for any dissipation of charge and high
> enough so that it is not a conductor, allowing a current flow.  For best results, a
> resistance in the tip assembly itself should range from $10^5$–$10^{12}$ ohms.

('479 Patent, col. 3, ll. 66-col. 4, ll. 14.)

The fact that "some claim language may not be precise . . . does not automatically render a

claim invalid. When a word of degree is used the district court must determine whether the

patent's specification provides some standard for measuring that degree." *Exxon*, 265 F.3d at

1381 (quoting *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir.

1984)).

While the specification in a patent must provide some means of measurement, construing

terms of degree with more precise language than the claim imposes improperly imports

limitations from the specification into the claim and also impinges on the role of the jury in

resolving the question of infringement.  *See, e.g.*, *Playtex Prods., Inc. v. Procter & Gamble Co.*,

400 F3d. 901, 907 (Fed. Cir. 2005) (the definition of "substantially flattened surfaces" improperly

introduced a numerical tolerance to flatness); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d

1352, 1361 (Fed. Cir. 2003) (refusing to impose a precise numeric constraint on the term "substantially uniform thickness"). This court is mindful that while it is the court's role to construe the claims, it is the jury's role to determine infringement. *Markman*, 517 U.S. at 384. Therefore, it would be improper for the court to import the $10^5$–$10^{12}$ ohms range from the specification into the term as it appears in the claims.

The doctrine of claim differentiation also counsels against importing numerical precision into the contested term, providing that "each claim in a patent is presumptively different in scope." *See RF Delaware, Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003). "The presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. As to the '479 Patent, in claims 1 and 19, their dependent claims specifically provide a numeric range limitation. Dependent claims 2 and 23 state:

2.    A tip as in claim 1 [which includes the disputed phrase], having a resistance in the range of $10^5$ to $10^{12}$ ohms.

23.    The method of claim 19 [which includes the disputed phrase], wherein said dissipative material has a resistance in the range of $10^5$ to $10^{12}$ ohms.

('479 Patent, col. 6, ll. 30-31 (claim 2); col. 7, ll. 27-28 (claim 23).)

The '479 Patent provides parameters for measuring the boundaries of "low enough to prevent a discharge of charge to a device and high enough to avoid current flow large enough to damage said device being bonded" and the phrase can be understood by a person having ordinary skill in the art. Therefore, the court finds this term to be sufficiently definite for submission to a jury without further clarification or construction.

33

**7.**      ***"In the range of $10^5$ to $10^{12}$ ohms"[10]***
         '479 Patent: claim 2, 23, 38
         '864 Patent: claims 28, 38

| CoorsTek's Construction | Reibers' Construction |
|---|---|
| at least 1 x $10^5$ ohms but less than 1 x $10^{12}$ ohms | having a value at or between 1 x $10^5$ ohms and 1 x $10^{12}$ ohms |

The dispute between the parties as to the construction of this term concerns the outside boundaries of the specified range. The parties agree that even though neither the '479 Patent nor the '864 Patent specifically so states, the lower numeral beginning the range is included within the range. CoorsTek argues that the upper numeral should not be included within the range because 1 x $10^{12}$ is insulating and therefore would not be included in the definition of dissipative as described within the Patents-in-Suit. The Reibers argue that the range would be commonly understood to include the upper figure in a range as the measure of resistance.

Within the specification for the '479 Patent, the patentee explained that resistance in the invention tool tip should be "low enough so that the material is not an insulator, not allowing for any dissipation of charge and high enough so that it is not a conductor, allowing a current flow." ('479 Patent, col. 4, ll. 9-12; *see also* similar language in '864 Patent, col 5, ll. 22-26.) CoorsTek argues the resistance value of $10^{12}$ cannot be included in the range, because the value $10^{12}$ is an insulator, not allowing for any dissipation of charge. Therefore, including the $10^{12}$ endpoint in the range would be contradictory to the plain language in the patents.

---

[10] As noted in Section II.C.4 herein, the Reibers have disclaimed the following claims in the Patents-in-Suit which also contain the disputed terms: '864 Patent, cls. 8, 17, and 25.

For the science behind the assertion, CoorsTek references the Blanchard Report and the ESD Glossary.  (*See* Pl.C.C.Br. at 27.)  Dr. Blanchard states, "Insulative materials are generally defined as materials with a measured *surface resistivity* greater than or equal to 1 x $10^{12}$ ohms/square or a volume resistivity greater than or equal to 1 x $10^{11}$ ohm-cm."  (Blanchard Report at ¶ 40 (emphasis added).)  It is apparently on this basis that CoorsTek argues that the term $10^{12}$ ohms is, therefore, insulative.  However, CoorsTek once again is relying upon definitions concerning "resistivity" and measurements of ohm-cm or ohm/square rather than the definition of resistance as used in the Patents-in-Suit.  The phrase before the court uses the word resistance and the measurements in the range are defined in ohms, not in ohms/square.  (*See, e.g.*, '479 Patent, cl. 2 ("A tip, as in claim 1, having a *resistance* in the range of $10^5$ to $10^{12}$ *ohms*")(emphasis added).)

"Reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents."  *Phillips*, 415 F.3d at 1318-19.  This is precisely what CoorsTek is attempting to have the court do by shifting the plain language of the Patents-in-Suit concerning resistance to a definition applicable to a different concept, surface resistivity.

Further, in the specification for both patents, the range of values is stated thus: "For best results, a resistance in the tip assembly itself should range *from about* 5 x $10^4$ or $10^5$ to $10^{12}$ ohms."  ('479 Patent, col. 2, ll. 9-10; '864 Patent, col. 2, ll. 23-25 (emphasis added).)  In the '864 Patent, child of the '479 Patent, the following additional phrase is added to clarify the range:

"This range of *resistances* is adequate no matter the method of characterizing the resistance." ('864 Patent, col. 2, ll. 25-27 (emphasis added).)

In the detailed description of the invention, the '479 Patent used a similar phrase: "For best results, a resistance in the tip assembly itself should range from $10^5$–$10^{12}$ ohms," substituting a dash for the word "to."   ('479 Patent, col. 4, ll.12-14.)   In a case involving a range phrased as "up to about," the Federal Circuit held that the range may include or exclude the endpoint, depending on the context.   The court found that where the endpoint is numeric (*e.g.*, counting up to ten, or seating capacity for up to seven passengers) the endpoint would normally be included in the computation.   *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1241 (Fed. Cir. 2003) (holding that "up to about 10%" included the 10% figure).   It would be ridiculous, for instance, to interpret instructions to "count up to ten" to require the counter to stop at nine.[11]   However, where the endpoint is physical (*e.g.*, painting the wall up to about the door) the endpoint may be excluded.   *Id*.

This court also finds that the ordinary meaning of the phrase "from number 'x' to number 'z'" would include the endpoint.   A person with ordinary skill in the art would interpret the range the same as the ordinary construction of such a term of range, so that the term "range from about $5 \times 10^4$ or $10^5$ to $10^{12}$ ohms" includes the endpoint because the phrase concerns numerical limits.

---

[11] The court notes an example closer to the case which employs the same principles. When citing to the Patents-in-Suit in their briefs, both parties employ the standard citation method of describing the location of a citation by column and line, *e.g.*, '479 Patent, 4:12-14 or col. 4, ll. 12-14.   In either, both lines 12 and 14 contain part of the citation.   In other words, the beginning point and the endpoint are included in the numerical range.

Therefore, the court construes the term *in the range of $10^5$ to $10^{12}$ ohms* to mean "a range having a value at or between $1 \times 10^5$ ohms and $1 \times 10^{12}$ ohms, inclusive of both the beginning point and the endpoint."

**8.    *"Static Discharge Time"***
    '548 Patent: claim 1

| CoorsTek's Construction | Reibers' Construction |
|---|---|
| the time required for a current from the bonding tool to the ground from its initial value to less than 10% of its initial value | time required for the charge to dissipate |

The term "static discharge time" appears in claim 1 of the '548 Patent which reads:

A device comprising:
A tip of a bonding tool having a dissipative material for use in wire bonding machines for connecting leads to integrate circuit bonding pads, wherein the tip has a static discharge time between 0.1 and 0.5 seconds.

('548 Patent, cl. 1.)  There appears to be no dispute that "static discharge" refers to the dissipation of electrical charge.  (Pl.C.C.Br. at 32; Def.C.C.Br. at 38.)  The disagreement between the parties' constructions of this term is only as to CoorsTek's desire to add a limitation specifying the lowest level of dissipation to be achieved by the end of the measurement cycle.

The specification of the '548 Patent states,

The static discharge was measured by charging bonding tool 10 and measuring the time required for the charge to dissipate. The charge was assumed to have dissipated once the current from the bonding tool 10 to ground dropped off significantly from its initial value (e.g., the current was less than 10% of its initial value).

('548 Patent, col. 11, ll. 55-59.)

Limitations from the specification (such as from the preferred embodiment), however, may not be read into the claims absent the inventor's express intention to the contrary. *Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002); *see also CCS Fitness, Inc. v. Brunswick Corp*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)).

In Article I, Section 8 of the United States Constitution, the Founders authorized Congress to enact laws "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Shortly thereafter Congress enacted the first patent law, declaring that anyone who had "invented or discovered any useful art, manufacture, engine, machine, or device or any improvement therein not before known or used" shall have "the sole and exclusive right and liberty of making, constructing, using and vending to other to be used" for a term not to exceed fourteen years. 1 Stat. 109-110 (1790); *see also Bilski v. Kappos*, ___ U.S. ___, 130 S. Ct. 3218, 3242 (2010) (providing history of U.S. patent system). Patents are a right to exclude others from gain from the invention, sometimes referred to as "exclusive advantages of commerce." *Bilski*, 130 S. Ct. at 3242. As such, the description of the boundaries of the invention is of paramount importance. A patentee must adequately notify the public of the scope of the invention. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005). A claim is adequately described when a person skilled in the art "would understand the bounds of the claim when read in light of the specification . . . [and the claim] reasonably apprise[s] those skilled in the art of the scope of

the invention . . . ." *Solomon v. Kimberly-Clark Co.*, 216 F.3d 1372, 1378 (Fed. Cir. 2000) (quotation omitted).

Time is obviously a unit of measure that can conceivably be influenced by any number of factors.  When measuring the amount of time it takes to perform a certain task, however, one most certainly needs the parameters of when the task begins and what constitutes full completion of the task.  In this case, in order to calculate "the time required for the charge to dissipate," a person of ordinary skill in the art would need to know the starting level of the charge and the amount of charge remaining, if any, to be considered sufficiently dissipated under the parameters of the test measurement; in other words, whether the ending voltage level should be at zero in relation to the starting charge level or some other remaining amount of charge.  In this instance, the claim term requires a specified parameter because the claim itself puts a time limit on the rate of dissipation.  Therefore, in order for the claim to be sufficiently clear to define the boundaries of the invention and put the public on notice, the public needs to know the parameters of the test, e.g., what constitutes the beginning point and the endpoint of the measurement of current dissipating.

The specification describes certain testing done with respect to an embodiment and suggests during that testing that the current should dissipate to 10% of its original charge level.  Therefore, the court construes the term "static discharge time" to mean "the time necessary for a charge to dissipate from its initial specified value to 10% of the stated initial value."

### 9.    *"Essentially Smooth Current"*
'864 Patent: claim 28
'548 Patent: claim 3

CoorsTek's Construction                          Reibers' Construction

a discharge of current that avoids a sudden       no construction required but in alternative: a
change of current                                 discharge of current without oscillation


The term "essentially smooth current" as it appears in claim 28 of the '864 Patent and

claim 3 of the '548 Patent provides,

> 28.    A method of using an electrically dissipative bonding tool tip, having a
> resistance in the range of $10^5$ to $10^{12}$ ohms, comprising: providing the
> electrically dissipative bonding tool tip; bonding a material to a device;
> allowing an *essentially smooth current* to dissipate to the device . . .
>
> 3.    A method of using a bonding tool tip, comprising: providing an electrically
> dissipative bonding tool tip; bonding a material to a device; allowing an
> *essentially smooth current* to dissipate to the device, . . .

('864 Patent, col 14, ll. 27-37 (emphasis added); '548 Patent, col. 12, ll. 56-64 (emphasis added).)

Both patents state "[c]ertain prior art devices emit one or more volts when the tip makes

bonding contact" and conclude that this sudden discharge upon contact "could damage the

integrated circuit or magnetic recording head." ('864 Patent, col. 1, ll. 57-62; '548 Patent, col. 1,

ll. 63-67.) Both patents also state, ". . . it is desirable for the bonding tool tip to discharge slowly.

The tip needs to discharge to avoid a sudden surge of current that could damage the part being

bonded." ('864 Patent, col. 2, ll. 20-23; '548 Patent, col. 2, ll. 27-30.)

Based on the intrinsic evidence, the court construes the term "essentially smooth current"

as a "a discharge of electrical current that avoids sudden surges."

**10.**     ***"High enough stiffness to resist bending when hot"***
          '479 Patent: claims 3, 24, 39
          '802 Patent: claim 3

**11.**     ***"High enough abrasiveness so as to function for at least two uses; high
          enough abrasiveness to as to function for at least 30,000 uses."***
          '479 Patent: claims 3, 24, 39
          '802 Patent: claim 4

| CoorsTek's Construction | Reibers' Construction |
|---|---|
| unable to ascertain a well-bounded definition for these terms | no construction required but in the alternative: |
| | sufficient stiffness to prevent deformation when hot; |
| | sufficient abrasion resistance to function for two or more uses; sufficient abrasion resistance to function for 30,000 or more uses |

Although the terms stiffness and abrasiveness are technical terms defined somewhat

different from a lay person's concept of the terms, the parties do not posit that a person of

ordinary skill in the art would not know the meanings of these two terms in the context of the

mechanical properties of an object.[12]  The embodiments in the '479 Patent speak to a "Rockwell

hardness" factor in describing the specific stiffness and durability of the invention.  ('479 Patent,

col. 4, ll. 23-26; *see also* '802 Patent, col. 4, ll. 49-52.)  CoorsTek's expert, Dr. Blanchard,

defines stiffness as "the ability of the object to withstand bending" and abrasiveness as "the

---

[12] The patents are clear that these terms define mechanical properties of the invention.
The specifications of the '479 and '802 Patents explain, "The tools must also have specific
mechanical properties to function satisfactorily. The high stiffness and high abrasion resistance
requirements have limited the possible material to ceramics (electrical non-conductors) or
metals, such as tungsten carbide (electrical conductor)."  ('479 Patent, col. 4, ll. 19-23; '802
Patent, col. 4, ll. 44-51.)

ability to abrade, *i.e.*, wear away, another object." (Blanchard Report at ¶¶ 68, 72.) This extrinsic evidence is consistent with the intrinsic evidence and is useful to the extent it further refines the definition of the terms "stiffness" and "abrasiveness" in the context of these patents at the time they were issued.

Based on the undisputed definitions, the court concludes that CoorsTek's objection to the phrases as they are written does not concern definition of the technical terms which would certainly be known to a person of ordinary skill in the art at the time of the invention, but rather to the terms of degree: "high enough . . . to resist bending . . ." and "high enough . . to function for at least ___ uses" as well as to the term "hot." (Pl.C.C.Br. at 28-30.)

As previously discussed, when construing a term of degree, a key question is whether the intrinsic evidence provides some standard for measuring that degree. *Exxon*, 265 F.3d at 1381. The '802 Patent expressly describes the basic mechanical parameters for the invention in terms of providing durability:

> Bonding tool tips must be sufficiently hard to prevent deformation under pressure and mechanically durable so that many bonds can be made before replacement. Prior art bonding tool tips are made of aluminum oxide, which is an insulator, but provide the durability to form thousands of bonding connections.

('802 Patent, col. 1, ll. 62-67.)

Obviously, terms such as "high enough" stiffness/abrasiveness or "sufficiently hard" are directly related to the function of the invention. In this case, the '479 Patent describes the invention as a tool which is attached to a bonding machine and through which is fed gold wire destined to become bonded to and form part of an integrated circuit. ('479 Patent, col.1, ll.15 - 39.) At the point where the tip of the tool comes closest to the device being bonded, "a separate

EFO (electronic flame off) device melts a bit of the wire, forming a bonding ball." (*Id*. col. 1, ll. 18-21.)  The bonding tool then moves rapidly from one bonding pad to another, stringing the gold wire in between.  "Pressure from the bonding tool tip and the transducer, and capillary action, 'flows' the wire onto the bonding pad where molecular bonds produce a reliable electrical and mechanical connection." (*Id*. col. 1, ll. 58-61.)  The '479 Patent then specifically sets forth a preferred Rockwell hardness component for the bonding tool tip—e.g. "[t]he tip should have a Rockwell hardness of about 25 or above, preferably of about 32 or above." ('479 Patent, col. 4, ll. 23-25.)[13]  The tool must also have the strength to perform under pressure and very fast speeds[14] and at temperatures consistent with the melting point of the gold wire being used in a given procedure, all without bending and wearing away prematurely.

From these limitations and embodiments, the patents themselves provide a standard for measuring these terms of degree, including the term "hot."  *See Exxon,* 265 F.3d at 1381.  It would be error for this court to import a more exact construction of these terms.  *See, e.g.*, *Playtex,* 400 F.3d at 907; *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) (a court, under the rubric of claim construction, may not give a claim additional specificity or precision beyond what is contained in the patent.)  Mathematical precision is not required to have valid and definite claims.  *Oakley, Inc. v. Sunglass Hut Intern*., 316 F.3d 1331, 1341 (Fed. Cir. 2003).  In general, "line-drawing" questions over what meets the scope of the claims is

---

[13] The '802 Patent calls for a Rockwell hardness of about 85 or above, preferably of about 89 or above, for its exemplary tool tip in Fig. 12. ('802 Patent, col. 4, ll. 49-51.)

[14] Uncontested testimony at the hearing indicated that the bonding machines create the bonded threading at very fast speeds.

appropriately left to the jury.  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[A] sound claim construction need not always purge every shred of ambiguity" because "resolution of some line-drawing problems . . . is properly left to the trier of fact").

On the other hand, it is incumbent upon the court to define the general scope of a claim within the framework of the intrinsic evidence.  Therefore, the court will construe the term "high enough stiffness to resist bending when hot" to mean "high enough stiffness or hardness to resist bending when the bonding tool reaches a temperature otherwise sufficient to melt the wire being used in the bonding process."

The court declines to construe further the term "high enough abrasiveness so as to function for at least two uses; high enough abrasiveness to as to function for at least 30,000 uses." However, the court will construe the term "abrasiveness" as "the ability to wear away another object or to resist being worn away by another object."  With that construction, the remainder of the phrase does not require further definition.

### IV.    *Summary of Claim Construction*

Based on the foregoing, the court construes the disputed claims language as follow:

1.      The term "resistance" which appears in the '479 Patent, claims 1-9, 19, 30, 37, 45, 46, 48, 50; the '864 Patent, claims 1-4, 7, 8, 16, 17, 24, 25, 27-29, 31, 33-35, 37; the '548 Patent, claims 1-3; and the '802 Patent, claims 1-13, is construed as "opposition to electrical current flow."

2.      The terms "electrically dissipative;" "dissipative material;" and "dissipative ceramic" which appear in the '479 Patent, claims 1, 5, 9, 19, 23-25, 42, 46-48, 50; the '864 Patent, claims 1, 4; and the '548 Patent, claim 1, are construed as: "Dissipative means having an

electrical resistance in the range between completely insulative and completely conductive, excluding both endpoints."

3.      The term "resistive material" which appears in the '479 Patent, claims 1, 5, 9, 19, 23-24, 46-48, 50; the '864 Patent, claims 1, 4; the '548 Patent, claim 1; and the '802 Patent, claims 1, 2, is construed as "resistive means opposing or resisting electrical current flow."

4.      The term "tip; bonding tip; bonding tool tip; tip of a bonding tool" which appears in the '479 Patent, claims 1-9, 19, 37, 46, 48, 50; the '864 Patent, claims 1-4, 7, 28, 29, 31, 33-35, 37; the '548 Patent, claims 1-3; and the '802 Patent, claim 1, is construed as "the output end of a bonding tool."

5.      The terms "insulating core" and "conducting core" which appear in the '479 Patent, claims 6, 7 (insulating core) and claims 8, 9, 29 (conducting core), are construed as: "Insulating core is a core formed of material which does not allow for any dissipation of electrical charge" and "Conducting core is a core formed from material which allows an electrical current flow."

6.      The term "resistance low enough to prevent a discharge of charge to a device and high enough to avoid current flow large enough to damage said device being bonded" appears in the '479 Patent, claims 1, 9, 19, 37, 46, 48, 50 and in the '802 Patent, claim 2.  The court finds this term to be sufficiently definite for submission to a jury without further clarification or construction.

7.      The term "in the range of $10^5$ to $10^{12}$ ohms" which appears in the '479 Patent, claim 38 and the '864 Patent, claims 28, 38, is construed as "a range having a value at or between $1 \times 10^5$ ohms and $1 \times 10^{12}$ ohms, inclusive of both the beginning point and the endpoint."

8.      The term "static discharge time" which appears in the '548 Patent, claim 1, is construed as "the time necessary for a charge to dissipate from an initial value to 10% of its initial value."

9.      The term "essentially smooth current" which appears in the '864 Patent, claim 28 and the '548 Patent, claim 3, is construed as a "a discharge of electrical current that avoids sudden surges."

10.     The term "high enough stiffness to resist bending when hot" which appears in the '479 Patent, claims 3, 24, 39 and the '802 Patent, claim 3, is construed as "high enough stiffness or hardness to resist bending when the bonding tool reaches a temperature otherwise sufficient to melt the wire being used in the bonding process."

11.     The terms "high enough abrasiveness so as to function for at least two uses; high enough abrasiveness to function for at least 30,000 uses" appear in the '479 Patent, claims 3, 24, 39 and the '802 Patent, claim 4.  The court has determined that the entirety of the phrase does not need further construction by the court, however, the term "abrasiveness" is construed to mean "the ability to wear away another object or to resist being worn away by another object."

Dated this 2d day of May, 2011.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge